# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CITY OF PROVIDENCE, RHODE ISLAND, derivatively on behalf of JPMORGAN CHASE & CO.,

Plaintiff,

v.

JAMES DIMON, JAMES A. BELL, CRANDALL C. BOWLES, STEPHEN B. BURKE, DAVID M. COTE, JAMES C. CROWN, ELLEN V. FUTTER, TIMOTHY P. FLYNN, LABAN P. JACKSON, JR., DAVID C. NOVAK, LEE R. RAYMOND, WILLIAM C. WELDON, ROBERT I. LIPP, WILLIAM LANGFORD, NINA NICHOLS, and MARTHA GALLO,

Defendants,

-and-

JPMORGAN CHASE & CO.,

Nominal Defendant.

C.A. No. 9692 - VCP

## MEMORANDUM OPINION

Date Submitted: March 10, 2015
Date Decided: July 29, 2015

Seth D. Rigrodsky, Esq., Brian D. Long, Esq., Gina M. Serra, Esq., Jeremy J. Riley, Esq., RIGRODSKY & LONG, P.A., Wilmington, Delaware; Jeffrey M. Padwa, Esq., CITY OF PROVIDENCE, RHODE ISLAND, Providence, Rhode Island, Frederic S. Fox, Esq., Jeffrey P. Campisi, Esq., Damien H. Weinstein, Esq., KAPLAN FOX & KILSHEIMER LLP, New York, New York, *Attorneys for Plaintiff City of Providence, Rhode Island*.

Gregory P. Williams, Esq., Catherine G. Dearlove, Esq., Christopher H. Lyons, Esq., RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; John F. Savarese, Esq., Emil A. Kleinhaus, Esq., C. Lee Wilson, Esq., WACHTELL, LIPTON, ROSEN &

KATZ, New York, New York; *Attorneys for Defendants James Dimon, Robert I. Lipp, William Langford, Nina Nichols, Martha Gallo, and Nominal Defendant JPMorgan Chase & Co.*

David C. McBride, Esq., William D. Johnston, Esq., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Stuart J. Baskin, Esq., Jaculin Aaron, Esq., SHEARMAN & STERLING LLP, New York, New York; *Attorneys for Defendants James A. Bell, Crandall C. Bowles, Stephen B. Burke, David M. Cote, James S. Crown, Ellen V. Futter, Timothy P. Flynn, Laban P. Jackson, Jr., David C. Novak, Lee R. Raymond, and William C. Weldon.*

**PARSONS, Vice Chancellor.**

The plaintiff brings this action derivatively on behalf of JPMorgan Chase & Co., alleging that the company's board of directors and other officer and employee defendants breached their fiduciary duties through failures of oversight. In particular, the complaint points to a series of costly settlements and consent orders that the company entered into with various government regulators in the last five years, all of which relate to alleged violations of federal anti-money laundering statutes and regulations.

The defendants moved to dismiss the complaint, contending that it is barred by res judicata, because at least one prior action in the U.S. District Court for the Southern District of New York arose out of the same series of transactions as the plaintiff's claims here. That action, also prosecuted derivatively on JPMorgan's behalf, was dismissed for failure to plead demand futility. The defendants further contend that collateral estoppel bars the plaintiff from re-litigating the issue of demand excusal as it relates to the company's board. Finally, the defendants argue that, even if I were to address the merits of the complaint, I should dismiss it for failure to plead that demand is excused as futile. The plaintiff counters by asserting that because the claims it brings are not the same as those in the prior New York action, neither claim nor issue preclusion applies here. The plaintiff also asserts that its complaint, unlike those in the prior actions, adequately pleads that a majority of the directors face a substantial likelihood of liability for their failures of oversight, and that demand is excused on that basis.

For the reasons stated herein, I conclude that the plaintiff's claims in this case arose out of the same series of transactions as the prior New York action. Based on the New York law of res judicata, therefore, I must dismiss the complaint in its entirety. In

1

light of this conclusion, I do not reach the defendants' other grounds for dismissal, nor do I address the separate motion to dismiss filed by three of the defendants who contest whether this Court has personal jurisdiction over them.

## I.    BACKGROUND[1]

### A.    Parties

Plaintiff, City of Providence, Rhode Island, brings this derivative action on behalf of the nominal defendant, JPMorgan Chase & Co. ("JPMorgan" or the "Company"), a Delaware corporation. Plaintiff continuously has owned JPMorgan common stock at all relevant times.

Defendants are current and former directors, officers, and employees of JPMorgan. Defendants James Dimon, James A. Bell, Crandall C. Bowles, Stephen B. Burke, James C. Crown, Timothy P. Flynn, Laban P. Jackson, Lee R. Raymond, and William C. Weldon (together, the "Board") are members of JPMorgan's board of directors. Except for Dimon, the Company's Chairman and CEO, all of the Director Defendants are outside, non-management directors. Defendants David M. Cote, Ellen V. Futter, David C. Novak, and Robert I. Lipp (the "Former Directors," and collectively with the Board, the "Director Defendants") previously were members of JPMorgan's board. Defendant Martha Gallo was the Company's Executive Vice President and

---

[1]    Unless otherwise noted, the facts are drawn from the well-pled allegations of Plaintiff's Verified Shareholder Derivative Complaint (the "Complaint"), and documents attached or integral thereto.

2

General Auditor between 2006 and 2011, at which time she became Head of Global Compliance and Regulatory Management.[2]

### B. Facts

Plaintiff charges Defendants with breaching their fiduciary duties in connection with JPMorgan's failure to comply with U.S. Bank Secrecy Act and Anti-Money Laundering ("BSA/AML") laws and regulations, as well as U.S. laws and regulations prohibiting certain transactions with countries and entities that had connections to terrorism and money laundering, like Cuba, the Islamic Republic of Iran, and the Republic of the Sudan. The crux of the Complaint is that, because of Defendants' failure to oversee the Company's operations and compliance during the "Relevant Period" (January 1, 2005, through January 7, 2014), the Company's reputation has been damaged, and its stockholders have had to bear the cost of over $2 billion in fines and penalties. In particular, and as recited in more detail below, Plaintiff contends that Defendants' oversight failures caused JPMorgan to enter into five settlements and consent orders with federal regulators: (1) an August 2011 settlement with the U.S. Department of the Treasury's Office of Foreign Asset Controls or "OFAC" (the "OFAC Settlement"); (2) a

---

[2]     William H. Gray, a former director of the Company, also was named as a Defendant, but has been voluntarily dismissed from the case. Docket Item ("D.I.") No. 11. The Complaint also named as Defendants two other JPMorgan employees, William Langford and Nina Nichols. They, along with Defendant Gallo, moved to dismiss the Complaint as it relates to them for lack of personal jurisdiction. Plaintiff did not oppose that motion as it related to Langford and Nichols. Pl.'s Answering Br. in Opp. to Def.'s Mot. to Dismiss for Lack of Personal Jurisdiction 1 n.1. I therefore dismiss the Complaint as it relates to those two Defendants.

3

January 2013 consent order with the Treasury's Office of the Comptroller of the Currency or "OCC" (the "2013 OCC Consent"); (3) a January 2013 consent order with the Federal Reserve Board (the "Fed Consent"); (4) a January 2014 Deferred Prosecution Agreement with the U.S. Attorney's Office for the Southern District of New York (the "DPA"); and (5) a January 2014 consent order with the OCC (the "2014 OCC Consent").[3]

### 1. Relevant statutory and regulatory regime

In 1970, Congress passed the Currency and Foreign Transactions Reporting Act, commonly known as the "Bank Secrecy Act," which established requirements for recordkeeping and reporting by private individuals, banks, and other financial institutions. The 1986 Money Laundering Control Act and the 1992 Annunzio-Wylie Anti-Money Laundering Act added to the Bank Secrecy Act's enforcement regime by imposing criminal liability on individuals or financial institutions that assist in laundering money or engage in transactions designed to avoid anti-money laundering reporting requirements. Since 1996, these provisions have required banking organizations to file a "Suspicious Activity Report" (or "SAR") whenever they detect a known or suspected criminal violation of the BSA/AML laws and regulations. The International Money Laundering Abatement and Anti-Terrorist Financing Act, included as part of the 2001 USA-PATRIOT Act, further enhanced the federal BSA/AML regime.

---

[3] *E.g.*, Compl. ¶¶ 6-12; *id.* Ex. A (the OFAC Settlement); *id.* Ex. B (the 2013 OCC Consent); *id.* Ex. C (the Fed Consent); *id.* Ex. D (the DPA); *id.* Ex. E (the 2014 OCC Consent).

Various federal government agencies play a role in enforcing the BSA/AML statutes, and implementing further regulations, but the Complaint focuses on the role of OFAC, the Financial Crimes Enforcement Network ("FinCEN"), and the federal banking agencies—the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of Thrift Supervision, and the OCC.[4] As relevant here, the federal banking agencies require each bank under their supervision to establish and maintain a BSA/AML compliance program. Pursuant to the USA-PATRIOT Act, a similar requirement is imposed by FinCEN. Criminal and civil monetary penalties can be sought against individuals and organizations for violating the BSA/AML laws.

In addition to its role within the BSA/AML regulatory infrastructure, OFAC administers and enforces U.S. economic and trade sanctions relating to targeted foreign countries, terrorist organizations, international drug traffickers, and organizations involved in proliferating weapons of mass destruction. Referring to these requirements as "U.S. Economic Sanctions," the Complaint alleges that they are "separate and distinct from the BSA," but "share a common national security goal."[5]

---

[4]     *E.g.*, Compl. ¶ 55.

[5]     *Id.* ¶ 66; *see also, e.g.*, *id.* ¶¶ 1, 3, 6.

### 2. The Company fails to comply with the relevant laws and regulations

The Complaint describes in detail JPMorgan's programs and policies designed to ensure compliance with the BSA/AML laws and U.S. Economic Sanctions.[6] The cornerstones of the Company's compliance regime were its "Know Your Customer" or "KYC" standards and its monitoring and screening of transactions to detect potentially risky individuals and entities. According to the Complaint, however, JPMorgan's KYC policies and monitoring were ineffective during the Relevant Period. One key failure that allegedly was brought to the attention of the Audit Committee of the Board—which was responsible for oversight of the Company's compliance—was inadequate management oversight of its KYC and due diligence processes.[7] As a result, the Company repeatedly failed to make timely referrals of suspicious activities as contemplated by the BSA/AML regulations.[8] Additionally, the Company failed adequately to screen for individuals and entities blacklisted by the U.S. Economic Sanctions.[9]

### a. The OFAC Settlement

Plaintiff alleges that the Company apparently violated U.S. Economic Sanctions on numerous occasions during the Relevant Period. For example, JPMorgan made a trade loan in December 2009 relating to a vessel affiliated with the blacklisted Islamic

---

[6]     *Id.* ¶¶ 72-98.

[7]     *Id.* ¶¶ 112, 201-206.

[8]     *Id.* ¶¶ 174-175, 187, 230-233.

[9]     *Id.* ¶¶ 99, 124, 130, 157, 160-162.

Republic of Iran Shipping Lines.[10] That and other violations allegedly were reported to the Board contemporaneously. Moreover, throughout this period, Audit Committee reports allegedly show that the Company knew about various weaknesses in its Global AML policies and U.S. Economic Sanctions compliance.

The alleged violations also came to the attention of federal regulators. On August 25, 2011, OFAC disclosed that JPMorgan had agreed to pay $88.3 million to settle potential claims for civil liability for non-compliance with the U.S. Economic Sanctions.[11]

### b. The 2013 OCC and Fed Consents

Plaintiff alleges that within a month of the OFAC Settlement, an update provided to the Audit Committee reported that rather than improving, the Company's due diligence programs geared toward OFAC and BSA/AML compliance in fact had "deteriorated."[12] The Complaint alleges that in the ensuing months, JPMorgan and the Board attempted to grapple with these continuing difficulties. In January 2013, however, the Company entered into a consent order with the OCC, which recited its findings that JPMorgan was deficient in its BSA/AML compliance.[13] Specifically, the 2013 OCC Consent highlighted the Company's failure to correct previously reported problems and to file Suspicious Activity Reports as required by the regulations. Further, the Consent Order

---

[10] *Id.* ¶¶ 153-159.

[11] *Id.* ¶ 183; OFAC Settlement ¶ 11.

[12] *Compl.* ¶ 192.

[13] *Id.* ¶¶ 216-217; 2013 OCC Consent.

criticized generally the Company's lack of organization-wide internal controls and monitoring, and specifically its OFAC compliance.[14]

Contemporaneous with the 2013 OCC Consent, the Company also executed a similar consent order with the Federal Reserve Board.[15] Neither the 2013 OCC Consent nor the Fed Consent resulted in a fine or penalty, but both identified remedial measures JPMorgan agreed to take to address deficiencies in its BSA/AML and U.S. Economic Sanctions compliance procedures. Both Consents called for the Company to develop an action plan and continue to report back to the relevant agencies about its progress in improving its regulatory compliance functions.

### c.  The DPA and the 2014 OCC Consent

According to Plaintiff, examinations conducted after the execution of the 2013 OCC Consent and the Fed Consent revealed continuing violations on JPMorgan's part. On January 7, 2014, the Company entered into another consent order with the OCC. The 2014 OCC Consent incorporated the findings from 2013, and added information about different violations.[16] In connection with the 2014 OCC Consent, JPMorgan agreed to pay a $350 million civil penalty.

The 2014 OCC Consent came one day after a substantially larger penalty was imposed on the Company. On January 6, 2014, JPMorgan and the U.S. Attorney for the Southern District of New York entered into the DPA, in which the Company accepted

---

[14]  2013 OCC Consent 4, 8-12, 20-22.

[15]  Fed Consent 1.

[16]  2104 OCC Consent 1-2.

8

responsibility for alleged misconduct described in a criminal "Information" filed against it, as well as a lengthy and detailed "Statement of Facts."[17] The Information, which resembles a complaint in format and substance, and the Statement of Facts both relate to the BSA/AML laws and regulations. Unlike the 2013 and 2014 OCC Consents, however, they focus primarily on JPMorgan's involvement in the Ponzi scheme orchestrated by Bernard L. Madoff. The Information and Statement of Facts indicate that the Company's actions in that regard violated several provisions of the BSA/AML statutes and regulations.[18] For example, JPMorgan failed to file SARs in connection with Madoff, even though the bank allegedly knew at some point before the Ponzi scheme collapsed that something probably was amiss. The DPA also linked the Madoff-related compliance failures to the Company's general failure to establish an adequate anti-money laundering program.

In addition to formally accepting responsibility for the conduct enumerated in the Information and the Statement of Facts, JPMorgan agreed in the DPA to cooperate with the U.S. Attorney and the Federal Bureau of Investigation in connection with those matters. The DPA required JPMorgan to continue its "ongoing effort to implement and maintain an effective BSA/AML compliance program in accordance with the requirements of the BSA and the directives and orders of any United States regulator . . .

---

[17]    DPA Exs. B-C.

[18]    *See id.*

9

including without limitation the OCC and Federal Reserve Board, as set forth in" the 2013 OCC Consent and the Fed Consent.[19]

Finally, and most notably, the DPA required JPMorgan to pay a fine of $1.7 billion dollars. That sum represents the bulk of the more than $2 billion in stockholder money that Plaintiff alleges has been paid to settle claims relating to the Company's inadequate BSA/AML compliance system during the Relevant Period.

### 3. Stockholder derivative litigation ensues

Shortly after the announcement of the DPA, several stockholder derivative actions were commenced. On February 3, 2014, Chaile Steinberg, a JPMorgan stockholder, filed a derivative action against certain defendants (including the Company's Board members) for breaches of fiduciary duty, violations of Section 14(a) of the Securities Exchange Act of 1934, waste of corporate assets, and unjust enrichment (the "Steinberg Action").[20] Steinberg claimed JPMorgan "was damaged by a series of six recent, high profile settlements with government agencies and private litigants arising out of allegations of egregious misconduct," one of which was the DPA.[21] The other five bases for Steinberg's claims appear to be unrelated to the DPA or to each other. They include: (1) a $410 million payment based on allegations that a JPMorgan energy subsidiary manipulated energy prices; (2) a report of federal authorities investigating alleged improprieties in JPMorgan's hiring program; (3) a combined $389 million payment for

---

[19]    DPA 6.

[20]    *See Steinberg v. Dimon*, 2014 WL 3512848, at *1 (S.D.N.Y. July 16, 2014).

[21]    *Id.*

10

Consumer Financial Protection Bureau and OCC penalties and refunds relating to claims that JPMorgan unfairly charged customers for credit-monitoring products; (4) a combined $2.4 billion in fines paid to the European Union and Japan for alleged manipulation of LIBOR-based benchmark interest rates; and (5) a combined $17.5 billion in settlements with institutional investors and the U.S. Department of Justice to resolve claims stemming from the subprime mortgage crisis.[22]

On February 19, 2014, a second derivative action against JPMorgan's Board was filed in the Southern District of New York by the Central Laborers' Pension Fund and the Steamfitters Local 449 Pension Fund (the "Central Laborers' Action").[23] Like the Steinberg Action, the Central Laborers' Action included claims for breaches of fiduciary duty, violations of the Securities laws, corporate waste, and unjust enrichment.[24] Unlike Steinberg's, however, the Central Laborers' complaint was more focused, relying primarily on the DPA and the related allegations concerning the Madoff Ponzi scheme.[25] Indeed, counsel for the plaintiff in the Central Laborers' Action apparently interviewed Madoff via telephone and in person several times before the announcement of the DPA

---

[22]     Compl. ¶¶ 44-173, *Steinberg v. Dimon*, No. 14 Civ. 688(PAC), 2014 WL 3512848 (S.D.N.Y. July 16, 2014).

[23]     *Cent. Laborers' Pension Fund v. Dimon*, 2014 WL 3639185, at *1 (S.D.N.Y. July 23, 2014).

[24]     *Id*. at *2.

[25]     *Id*. at *1-2.

and filing of the Central Laborers' complaint.[26]  Thus, I find that factual allegations pertaining to the Madoff Ponzi scheme and JPMorgan's failures in that connection permeate the Central Laborers' complaint.[27]

In July 2014, both the Steinberg Action and the Central Laborers' Action were dismissed for failing adequately to plead that demand upon the JPMorgan Board was excused as futile.[28]  In both cases, the court held that the plaintiff had failed to demonstrate that the director defendants faced a "substantial likelihood" of liability such that it would have been reasonable to doubt that the Board could have exercised disinterested and independent judgment in considering a demand.[29]  In both cases, the court found that the plaintiffs critically failed to allege facts suggesting that the Board was aware of the "red flags" the plaintiffs identified,[30] which knowledge would have

---

[26]  *E.g.*, Compl. ¶¶ 5, 14, *Cent. Laborers' Pension Fund v. Dimon*, No. 14 Civ. 1041(PAC), 2014 WL 3639185 (S.D.N.Y. July 23, 2014).

[27]  *See Cent. Laborers' Pension Fund*, 2014 WL 3639185, at *1 ("Plaintiffs allege that JPMorgan was well-positioned to identify Madoff's criminal activity because it had access to vast amounts of financial information about BMIS and routinely performed due diligence on BMIS's accounts. Rather than identifying and reporting Madoff's fraud, however, JPMorgan 'turn[ed] a blind eye to Madoff's thievery.' Specifically, Plaintiffs claim that Defendants Shipley and Lipp were repeatedly confronted with significant concerns about irregularities in BMIS's SEC filings, but chose to ignore these red flags because they feared the loss of the lucrative accounts of BMIS and Norman Levy, a longtime customer of BMIS.") (citations omitted).

[28]  *Id.* at *6; *Steinberg*, 2014 WL 3512848, at *5.

[29]  *Cent. Laborers' Pension Fund*, 2014 WL 3639185, at *3-4; *Steinberg*, 2014 WL 3512848, at *3-4.

[30]  *Cent. Laborers' Pension Fund*, 2014 WL 3639185, at *4 ("Here, Plaintiffs point to a number of alleged red flags surrounding BMIS, without showing that the

12

been necessary to establish a substantial likelihood of liability for the *Caremark*[31] claims the plaintiffs sought to prosecute derivatively on the Company's behalf.

### C.      Procedural History and Parties' Contentions

Plaintiff served a demand for books and records on JPMorgan's Board in January 2013, in response to which the Company provided approximately 5,000 pages of documents.  Plaintiff commenced this action on May 23, 2014.  The Complaint charges all Defendants with a failure of oversight rising to the level of a breach of fiduciary duty under this Court's *Caremark* decision.  According to Plaintiff, Defendants knew the Company's efforts to remediate its BSA/AML deficiencies were unsuccessful, and yet allowed the Company's compliance systems to deteriorate further, ultimately resulting in over $2 billion in regulatory fines and penalties.[32]

---

Outside Directors had knowledge of these red flags.  Plaintiffs allege, for instance, that BMIS's Financial and Operational Combined Uniform Single Reports contained major discrepancies that were detected by JPMorgan employees.  But Plaintiffs do not allege that any of the Outside Directors were ever told about these discrepancies.  As a result, any alleged red flags are insufficient to demonstrate bad faith on the part of the Outside Directors and therefore cannot demonstrate a substantial likelihood of liability for the *Caremark* claims.") (citations omitted); *Steinberg*, 2014 WL 3512848, at *3 ("To establish bad faith, Steinberg identifies a number of purported 'red flags' that should have alerted the Board to the misconduct underlying each of the six investigations.  But Steinberg fails to provide particularized facts demonstrating that any of the Outside Directors knew or should have known about any of the alleged 'red flags.'  For example, the Complaint refers to various internal reports and communications, but never alleges that the Board ever saw these documents.") (citations omitted).

[31]     *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[32]     *E.g.*, Pl.'s Answering Br. [hereinafter "PAB"] 1-5.

13

Defendants seek dismissal of the Complaint in its entirety. In support of their motion they contend that: (1) the New York law of collateral estoppel precludes Plaintiff from litigating the issue of demand futility as it relates to JPMorgan's Board; (2) the New York law of res judicata bars Plaintiff from bringing derivative claims arising out of the Company's BSA/AML and U.S. Economic Sanctions violations during the Relevant Period; and (3) even if Plaintiff could litigate its derivative claims here, the Complaint should be dismissed for failure adequately to plead that demand is excused as futile.

Plaintiff counters the first two arguments, in part, by contending that the allegations contained in its Complaint are different from those raised by the plaintiffs in the previous lawsuits.[33] Regarding the question of collateral estoppel, Plaintiff further emphasizes the differences between its derivative Complaint and others previously filed by JPMorgan stockholders, arguing that a finding of collateral estoppel against it would be improper because it has not had a full and fair opportunity to litigate the demand futility issue. Finally, Plaintiff asserts that dismissal under Rule 23.1 is not warranted here because demand is excused as futile, because Plaintiff's allegations support a reasonable inference that a majority of the Director Defendants either face a substantial risk of liability, or are conflicted and cannot consider a demand.

## II.    ANALYSIS

I first consider Defendants' argument that res judicata bars Plaintiff from bringing this action. Because I conclude that Plaintiff's claims are precluded under the doctrine of

---

[33]    PAB 20-24, 29-31.

res judicata, I do not address Defendants' second and third arguments, relating to collateral estoppel and demand futility. Nor do I reach the separate motion to dismiss, which asserts that this Court lacks personal jurisdiction over Defendant Gallo. Because Plaintiff is precluded from bringing any derivative claim relating to the Company's BSA/AML and U.S. Economic Sanctions violations during the Relevant Period, Gallo's separate motion to dismiss is moot.

### A.        Legal Standard

The Full Faith and Credit Clause of the United States Constitution and the Full Faith and Credit Act have "long been understood to encompass the doctrines of res judicata, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'"[34] Thus, this Court is required to give a judgment from another jurisdiction the same preclusive effect that it would be given by the court rendering the judgment.[35] While neither the Full Faith and Credit Clause nor the related statute explicitly apply when the court rendering judgment is a federal court, the U.S. Supreme Court has held that a state court must give a federal judgment the same force and effect as it would be given under the preclusion law of the state in which the federal court sits.[36]

In this case, both of the prior judgments in the cases Defendants cite in support of their preclusion argument—*i.e.*, *Steinberg* and *Central Laborers'*—are judgments of the

---

[34]     *San Remo Hotel, L.P. v. City & Cty. of S.F.*, 545 U.S. 323, 336 (2005); U.S. Const. art. IV, § 1; 28 U.S.C.A. § 1738 (West 2015).

[35]     *Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 615 (Del. 2013).

[36]     *Id*. at 615-16 (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)).

15

U.S. District Court for the Southern District of New York. This Court, therefore, is required to give the judgments in *Steinberg* and *Central Laborers'* the same force and effect as each of them would be afforded in New York courts under the New York law of preclusion.[37] The Delaware Supreme Court has applied these principles in the same legal context presented in this case, holding that, once a court of competent jurisdiction has issued a final judgment, a successive case is governed, under the full faith and credit doctrine, by the principles of collateral estoppel and res judicata rather than by demand futility law.[38] Thus, I apply New York law to analyze the parties' res judicata arguments.

### B.       Under New York Law, the Complaint is Barred by Res Judicata

Under New York res judicata law, a party may not litigate a claim "where a judgment on the merits exists from a prior action between the same parties involving the same subject matter. The rule applies not only to claims actually litigated but also to claims that could have been raised in the prior litigation."[39] As relevant here, under New York law, the dismissal of a derivative action for failure to plead demand futility is a final judgment on the merits for purposes of res judicata.[40] Thus, the only questions I must

---

[37]     *Id.* at 616.

[38]     *Id*.

[39]     *In re Hunter*, 827 N.E.2d 269, 274 (N.Y. 2005) (internal quotation marks and citations omitted).

[40]     *Henik ex rel. LaBranche & Co. v. LaBranche*, 433 F. Supp. 2d 372, 379 (S.D.N.Y. 2006) (applying New York law) ("[I]t is concluded that the issue of whether or not the [corporation's] board of directors did not lack the disinterestedness and independence needed to consider a demand—albeit technically a procedural issue of standing to proceed derivatively—does constitute 'a decision on the merits' for the purposes of preclusion.").

16

address are whether either of the prior actions involved the same parties and the same subject matter as this case. I conclude that the Steinberg and Central Laborers' Actions both involved the same parties as this case. I next conclude that the subject matter of this case is the same as that of, at least, the Central Laborers' Action. Because Defendants have shown that those two required elements are satisfied, they are entitled to dismissal of the Complaint on res judicata grounds.

### 1. Same parties

Under New York law, a later stockholder asserting derivative claims on behalf of a corporation is considered to be the "same plaintiff" as a different stockholder asserting those claims on behalf of the corporation in a separate action.[41] Assuming the subject matter of the claims is the same, res judicata will bar the later stockholder from stating a derivative claim if the previous claim was dismissed for failure to plead demand futility.

Both the Steinberg Action and the Central Laborers' Action involved stockholder derivative plaintiffs purporting to bring suit against the Board on behalf of JPMorgan. Thus, under New York law, the plaintiff in this case is the "same plaintiff" as the plaintiff in the Steinberg and Central Laborers' Actions for purposes of preclusion.[42] Here, the

---

[41] *Id.* at 381 ("Therefore, it is concluded that although Henik and Lewis were not named Plaintiffs in the *Brown* action, there is nothing differentiating the standing analysis to be undertaken from that done so in *Brown,* and preclusive effect shall be given to the *Brown* dismissal.").

[42] *Id.*; *see also id.* at 380 ("It makes no difference, in the absence of fraud or collusion, that a stockholder's suit is prosecuted by one or more, or by all, the stockholders; the suit being brought on behalf of all others of like interest joining therein. . . . [T]he action is really the action of all the stockholders, as it is necessarily commenced in their behalf and for their benefit. And as in such suits

17

City of Providence makes no serious attempt to contend that it is a different plaintiff than those in the Steinberg and Central Laborers' Actions. Instead, it asserts in conclusory fashion that it is "a different stockholder, bringing different claims, relying on facts that were not even *known* to the plaintiffs in the prior actions."[43] Even accepting those premises as true, however, they are insufficient to avoid the conclusion that Plaintiff here is the same as in the prior actions under long-settled New York law holding that a prior judgment dismissing a stockholder derivative complaint "is conclusive not only upon the stockholders who brought the suit but upon the corporation also and upon those who had the right to intervene but did not avail themselves of it."[44] Thus, Defendants have satisfied this element of the res judicata analysis.

### 2. Same subject matter

Under New York's "transactional analysis" approach to res judicata, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a

---

the wrong to be redressed is the wrong done to the corporation and as the corporation is a necessary part[y] to the suit, it inevitably follows that there can be but one adjudication on the rights of the corporation.") (quoting *Dana v. Morgan*, 232 F. 85, 89 (2d Cir. 1916)).

[43]     PAB 30. I note that Plaintiff neither briefed nor argued whether Defendants here are the same as the defendants in the Steinberg and Central Laborers' Actions, or if they are not the same, whether any such distinction matters under New York's law of res judicata. I therefore deem any argument Plaintiff might have raised in this regard to be waived. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

[44]     *Dana*, 232 F. at 89.

18

different remedy."[45]  If a successive action seeks "what is essentially the same relief for harm arising out of the same or related facts such as would constitute a single factual grouping," the second action will be barred by res judicata, notwithstanding "that the theories involve materially different elements of proof," or that "alternative theories are available [on which] to recover."[46]  Taking all allegations in the Complaint as true, and drawing reasonable inferences in favor of Plaintiff, I am convinced that its Complaint is barred because the claims it advances arise out of the same series of transactions that were at issue in the Central Laborers' Action.[47]

The essence of Plaintiff's Complaint is that the Board faces a substantial likelihood of liability for its bad faith oversight failures in relation to the Company's BSA/AML and U.S. Economic Sanctions compliance.  The "series of transactions" that the Complaint identifies as giving rise to those *Caremark* claims are, as discussed above,

---

[45]  *Hunter*, 827 N.E.2d at 274.

[46]  *O'Brien v. City of Syracuse*, 429 N.E.2d 1158, 1160 (N.Y. 1981) (quotation marks and citations omitted).

[47]  If Defendants had been able to rely only on the Steinberg Action as the basis for their res judicata argument, the question might have been closer.  As noted above, the Steinberg Action reflects a kitchen-sink approach to pleading, in which multiple unrelated instances of alleged wrongdoing were thrown rather perfunctorily into the same complaint.  But, one of the instances of wrongdoing included therein was the DPA, which is a major aspect of Plaintiff's Complaint here, and (as I discuss *infra*) appears to be inextricably linked to the OFAC Settlement, the 2013 OCC Consent, the Fed Consent, and the 2014 OCC Consent.  In any event, because the Central Laborers' Action was exclusively about the DPA, I focus my preclusion analysis on that case, and consider it duplicative to analyze separately whether the Steinberg Action also might provide a basis for barring this Complaint under New York's res judicata doctrine.

the OFAC Settlement, the 2013 OCC Consent, the Fed Consent, the DPA, and the 2014 OCC Consent. The DPA, however, also was the centerpiece of the Central Laborers' cause of action. Theoretically, if the DPA was not a part of one "series of transactions" that also includes the OFAC Settlement, the 2013 OCC Consent, the Fed Consent, and the 2014 OCC Consent, Plaintiff here might not be barred from prosecuting claims that arose from those other transactions, even if the *Central Laborers'* judgment would bar it from re-litigating any DPA-related claims. The relevant inquiry, therefore, is whether the DPA can be separated from the other settlements and consent orders and treated as a distinct "factual grouping,"[48] such that the claims relating to the other settlements and consent orders might avoid preclusion. I conclude that it cannot, for two reasons.

First, the DPA itself indicates that, rather than relating solely to the Madoff Ponzi scheme, that settlement was part and parcel of JPMorgan's overall resolution of continuing BSA/AML and OFAC compliance violations that had given rise to the previous settlements and consent orders. To begin with, even the Madoff-related allegations in the DPA were themselves BSA/AML violations: in connection with the Madoff situation, the government accused the Company of violating provisions of the U.S. Code and federal regulations that I discussed in Section I.B.1 *supra* as part of the BSA/AML regulatory infrastructure.[49] For example, one allegation was that JPMorgan failed to file a Suspicious Activity Report in connection with Madoff, as required by the

---

[48]     *O'Brien*, 429 N.E.2d at 1160.

[49]     *See* DPA Ex. B (the Information) ¶¶ 4-6, 11-15.

BSA/AML rules. That fact alone undermines Plaintiff's suggestion that there is a meaningful distinction between JPMorgan's alleged transgressions related to the Madoff scheme on the one hand, and its BSA/AML compliance problems on the other.

In addition, the DPA explicitly references and re-affirms JPMorgan's obligations under the 2013 OCC Consent and the Fed Consent. Specifically, it states that "JPMorgan shall continue its ongoing effort to implement and maintain an effective BSA/AML compliance program in accordance with the requirements of the BSA and the directives and orders of any United States regulator . . . including without limitation the OCC and Federal Reserve Board, as set forth" in the 2013 OCC Consent and the Fed Consent.[50] Similarly, the 2014 OCC Consent references the 2013 OCC Consent and the DPA.[51] It also includes a finding that JPMorgan's "internal controls, including filtering processes and independent testing, with respect to Office of Foreign Asset Control ("OFAC") compliance are inadequate," and that those inadequacies resulted in the Company "operat[ing] outside of the normal AML monitoring and OFAC screening controls."[52] The 2013 OCC Consent similarly included a finding that JPMorgan's OFAC compliance systems were inadequate.[53] Thus, the relevant settlement and consent order documents themselves indicate that each individual transaction was part of one series of transactions relating to the Company's resolution of various alleged BSA/AML and OFAC violations

---

[50]    DPA ¶ 19.

[51]    2014 OCC Consent 1-2; *see also* Compl. ¶¶ 229, 234.

[52]    2014 OCC Consent 4.

[53]    2013 OCC Consent 4.

during the Relevant Period. In other words, it is not possible to read the OFAC Settlement, the 2013 OCC Consent, the Fed Consent, the DPA, and the 2014 OCC Consent and conclude that they do not form a "single factual grouping" and make "'a convenient trial unit.'"[54]

A further ground for concluding that the DPA is part of a series of transactions along with the other BSA/AML settlements and consent orders is that Plaintiff's own allegations indicate that it is. Plaintiff's unitary treatment of the settlements and consent orders is illustrated, for example, by its repeated assertion that JPMorgan's violations resulted in over $2 billion in damages to the Company.[55] This aggregation of the Company's OFAC, OCC, and DPA sanctions and fines into one larger grouping undermines Plaintiff's attempt now to argue that the claims in the Central Laborers' Action—with its heavy reliance on the DPA—arose out of an entirely separate series of transactions than the claims Plaintiff seeks to prosecute here. The fact that Plaintiff swept all of the alleged wrongdoing into one defined "Relevant Period" similarly reveals

---

[54] *UBS Sec. LLC v. Highland Capital Mgmt., L.P.* 927 N.Y.S.2d 59, 64 (N.Y. App. Div. 2011) (quoting *Smith v. Russell Sage Coll.*, 429 N.E.2d 746, 749 (N.Y. 1981)).

[55] *E.g.*, PAB 2-3 ("[The Complaint's] allegations—buttressed by findings of federal regulators that the Company's violations of U.S. Economic Sanctions were 'egregious' and 'reckless' and that the Company's BSA/AML compliance program was deficient in violation of U.S. law—demonstrate a sustained and systemic failure of oversight by Defendants, which caused substantial damage to the Company and its stockholders when the Company's regulators imposed fines and penalties amounting to over $2 billion."); Compl. ¶¶ 5, 13.

the continuous and integral nature of the alleged wrongdoing that gave rise to the OFAC Settlement, the 2013 and 2014 OCC Consents, the Fed Consent, and the DPA.

More broadly, throughout the Complaint and in its briefing, Plaintiff recited the facts in a way that suggests that neither the DPA nor any one of the other settlements and consent orders readily could be segregated from the others. In discussing JPMorgan's BSA/AML compliance policies and procedures, the Complaint alleges that the Company addressed the various BSA/AML and U.S. Economic Sanctions laws and regulations as a unit, especially after 2005 when six existing Company compliance policies were consolidated into one document.[56] When detailing the numerous allegations of compliance violations during the Relevant Period, the Complaint moves from one to the next in a continuous narrative with little or no regard to which settlement or settlements were implicated. Even in its opposition to this motion, Plaintiff seamlessly ties together the OFAC Settlement, 2013 OCC and Fed Consents, the DPA, and the 2014 OCC Consent. For example, Plaintiff connected the OFAC Settlement with the succeeding 2013 OCC Consent by stating, "Even after the OFAC settlement, the core defects with the Company's BSA/AML compliance systems were not corrected."[57] Then, linking those two transactions with the 2014 OCC Consent and the DPA, Plaintiff asserted that, "Incredibly, in the wake of the OFAC penalty and the 2013 Consent Order, the Company

---

[56]  Compl. ¶¶ 72-89.

[57]  PAB 16.

23

continued violating BSA/AML laws and regulations."[58]  The entirety of the Complaint's allegations and Plaintiff's assertions in its briefing and argument support the conclusion that the OFAC Settlement, the 2013 OCC Consent and Fed Consent, the DPA, and the 2014 OCC Consent form one series of transactions.  That is, they fit together as a "factual grouping," insofar as they are "'related in time, space, origin, or motivation'" and because "'their treatment as a unit conforms to the parties' expectations or business understanding or usage.'"[59]

In sum, both the documents relating to JPMorgan's settlements and consent orders during the Relevant Period and Plaintiff's own allegations support the conclusion that the DPA was one aspect of a series of transactions for purposes of preclusion analysis.  Because claims arising out of the DPA were reduced to a final judgment in the Southern District's *Central Laborers'* decision, any and all claims arising out of the same series of transactions are barred by New York's transactional approach to res judicata.  All of Plaintiff's claims in this action fall within that series of transactions.  I conclude, therefore, that Plaintiff is precluded from re-litigating those claims here.

---

[58]     *Id*. at 18.  Statements like these, in addition to all the other circumstances already discussed, undermine Plaintiff's attempt to differentiate this case from the Central Laborers' Action by arguing that the OFAC Settlement was not mentioned in the complaint in that action.  *E.g.*, Arg. Tr. 44.  It is not legally relevant that the OFAC Settlement may have evaded the plaintiff's attention in the Central Laborers' Action; what matters is whether that transaction is part of one series of transactions, including the DPA.  I find that it is.

[59]     *UBS Sec. LLC*, 927 N.Y.S.2d at 64 (quoting *Russell Sage Coll.*, 429 N.E.2d at 749).

In arguing for a contrary conclusion, Plaintiff contends that a prior judgment precludes a subsequent suit under res judicata "only 'where the **same evidence** is needed to support both claims, and where the **facts essential to the second were present in the first**.'"[60] Plaintiff further asserts that "the evidence and allegations in support of Plaintiff's claims in this action differ[] from the evidence in *Central Laborers'*. Here, Plaintiff is a different stockholder, bringing different claims, relying on facts that were not even *known* to the plaintiffs in the prior actions."[61] According to Plaintiffs, the Central Laborers' complaint, unlike its own, "focused exclusively on one limited issue— the Company's relationship with Bernard Madoff."[62] Admittedly, the factual allegations in the Central Laborers' complaint differ substantially from the allegations in the Complaint here, insofar as the Central Laborers' allegations focus almost entirely on JPMorgan's connection to the Madoff Ponzi scheme, while Plaintiff studiously avoids discussing that situation at any length.[63]

The problem is that Plaintiff's argument rests on an articulation of the law of res judicata that the New York Court of Appeals has expressly abandoned. This has been explained in recent cases like *UBS Securities LLC v. Highland Capital Management,*

---

[60]    PAB 29-30 (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1464 (2d Cir. 1996) (emphasis added by Plaintiff)).

[61]    *Id*. at 30 (internal citation omitted).

[62]    *Id*. at 22.

[63]    Madoff is mentioned, however, several times in Plaintiff's Complaint. *E.g.*, Compl. ¶¶ 143, 230.

*L.P.*[64]  There, the Appellate Division stated, "It used to be the rule that, even if the two actions arose out of an identical course of dealing, the second was not barred by res judicata if '[t]he requisite elements of proof and hence the evidence necessary to sustain recovery var[ied] materially.'"[65]  As noted by the court in *UBS Securities*, however, the New York Court of Appeals "expressly rejected that method of analysis in *O'Brien v City of Syracuse.*  There it held that 'once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.'"[66]  The reason is that when different theories or evidence relate to "'harm arising out of the same or related facts such as would constitute a single 'factual grouping,' the circumstance that the theories involve materially different elements of proof will not justify presenting the claim by two different actions.'"[67]

The *First Jersey Securities, Inc.* case, on which Plaintiff relies in this regard, cites to a line of cases that stemmed from the New York Court of Appeals' 1953 opinion in *Smith v. Kirkpatrick.*[68]  But the *O'Brien* Court overruled *Smith* to the extent that case

---

[64]     927 N.Y.S.2d 59 (N.Y. App. Div. 2011).

[65]     *Id*. at 64 (quoting *Smith v. Kirkpatrick*, 111 N.E.2d 209 (N.Y. 1953)).

[66]     *Id*. (quoting *O'Brien v. City of Syracuse*, 429 N.E.2d 1158, 1159 (N.Y. 1981)).

[67]     *Id* (citation omitted).

[68]     *See First Jersey Sec., Inc.*, 101 F.3d at 1464; *NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983); *Tucker v. Arthur Andersen & Co.*, 646 F.2d 721, 727 (2d Cir. 1981); *McNellis v. First Fed. Sav. & Loan Ass'n of Rochester*, 364 F.2d 251, 255-56 (2d Cir. 1966); *Herendeen v. Champion Int'l Corp.*, 525 F.2d 130, 133-34 (2d Cir. 1975).  In this regard, I note that *First Jersey Securities* relies

could be read as supporting a test for res judicata different from the transactional analysis approach articulated in *O'Brien*.[69]  Plaintiff's argument, therefore, rests on an incorrect statement of the New York law of res judicata.  Even if *First Jersey Securities* set forth the correct standard, however, it is materially distinct from this case.  There, the court refused to apply res judicata to the plaintiff's claims arising out of a series of fraudulent transactions that occurred from 1982 to 1985, where the defendant had entered into a settlement with the SEC regarding other allegedly fraudulent transactions that occurred between 1975 and 1978.  The court therefore concluded that the later complaint was not based on the same transaction or series of transactions as the earlier settlement.[70]  As discussed above, the alleged wrongdoing in this case on which Plaintiff bases its Complaint is the same wrongdoing on which the Central Laborers' Action was premised: the Company's numerous alleged BSA/AML and U.S. Economic Sanctions violations during the Relevant Period.  Thus, even if the factual story Plaintiff told in its Complaint and the evidence it would need to prove its claims are considered different from those in the Central Laborers' Action, that still would not enable Plaintiff to avoid New York's res judicata doctrine, because the underlying series of transactions is the same.

---

on *NLRB*, which cites to *Tucker* and *Herendeen*; *Tucker* itself also cites to *Herendeen*, as well as to *McNellis*.  *Herendeen* and *McNellis*, however, both rely on and cite to language in *Smith* that appears inconsistent with *O'Brien*.

[69]     *O'Brien*, 429 N.E.2d at 1160 n.1.

[70]     *First Jersey Sec., Inc.*, 101 F.3d at 1464 ("Plainly, the SEC could neither have included its present claims with respect to transactions occurring in 1982–1985 in its 1979 administrative charge nor proven those transactions in a hearing that did not extend past 1980.").

### III. CONCLUSION

For the foregoing reasons, I grant Defendants' motion and dismiss the Complaint in its entirety with prejudice on grounds of res judicata.

**IT IS SO ORDERED**.